**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRANCIS LUCCHESE-SOTO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE CRITERION COLLECTION, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Francis Lucchese-Soto ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendant The Criterion Collection, LLC ("Criterion" or "Defendant") for violating the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.      The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

3.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

1

4.      Criterion is an American home-video distribution company that focuses on licensing, restoring, distributing, and streaming classic and contemporary films.  In addition to selling physical DVDs and Blu-Ray discs, it also operates the Criterion Channel video streaming service for a monthly cost of $10.99 (or $99.99 per year).  This subscription allows members to stream certain films on demand and provides access to Criterion24/7, which provides members with a continuous stream of Criterion's films.  Users can stream the Criterion Channel through its website: https://www.criterionchannel.com/ (the "Website").

5.      The Criterion Channel also has a mobile application available on Android and iOS devices (together, the "App").  The App and the Website are collectively referred to as the "Criterion Channel Service."

6.      The Criterion Channel is available in the United States and Canada.

7.      The Criterion Channel web and mobile application uses Vimeo OTT (over-the-top) for hosting its content as well as for advertising and analytics purposes.

8.      Unbeknownst to Plaintiff and Class Members, Defendant knowingly and intentionally discloses Criterion Channel Service users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties.  By doing so, Defendant is violating the VPPA.

9.      Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

## I.    HISTORY AND OVERVIEW OF THE VPPA

10.      The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie

rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (cleaned up).

11.     In 2012, Congress amended the VPPA, and in so doing, reiterated the VPPA's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

12.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

13.     Criterion, via the Criterion Channel Service, provides "an independent streaming

service that features an eclectic mix of classic and contemporary films from Hollywood and around the world, many not available anywhere else. In addition to hosting the Criterion Collection and Janus Films' celebrated library of more than 1,500 films, it also features titles from a wide array of studio and independent licensors and original programming exclusive to the service. Along with the constantly refreshed thematic programming, subscribers to the Criterion Channel can also enjoy more than 500 shorts and 5,000 supplementary features, including trailers, introductions, behind-the-scenes documentaries, interviews, video essays, commentary tracks, and rare archival footage."[1]  In short, the Criterion Channel contains pre-recorded videos that are available for users who purchase a subscription to watch.

14.    To receive access to the Criterion Channel Service, a user must specifically register for it.  To access the Criterion Channel Service through a paid subscription or a free trial, a user must provide his or her "name, e-mail address, billing address, or credit card number."[2]  Users pay either $10.99 per month or $99.99 per year, and a paid subscription is required to access Criterion Channel's pre-recorded videos.

15.    The Criterion Channel Service is available throughout the United States and Canada.

16.    The Criterion Channel App has over 100,000 downloads on the Google Play Store alone.[3]

---

[1] https://www.criterion.com/faq/channel.

[2] https://www.criterionchannel.com/privacy; *see also* https://www.criterionchannel.com/checkout/subscribe/purchase.

[3] *See* https://play.google.com/store/apps/details?id=com.criterionchannel&hl=en_US.

### III.    DEFENDANT DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES

#### A.    Testing Reveals That Defendant Illegally Shares Class Members' PII And Viewing Information to Third Parties Twilio and Vimeo

17.    Prior to the commencement of this action, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the App and Website.  A "dynamic analysis" records the transmissions that occur from a user's device.

18.    The private researchers tested what information (if any) Defendant discloses when a user watches a pre-recorded video on The Criterion Channel Service.

19.    The analysis first established that Defendant incorporates multiple "application programming interfaces" ("APIs") into the Website and App.

20.    APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[4]  An API can "work[] as a standalone solution or included within an SDK. … [A]n SDK often contains at least one API."[5]  "SDK stands for software development kit and "is a set of software-building tools for a specific program, while "API" stands for application programming interface.[6]  As used in this Complaint, "SDK" and "API" are referring to the same software.

21.    Defendant integrates into its Website and App the Segment API ("Segment", an API owned and operated by Twilio Inc. ("Twilio").

---

[4] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[5] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/.

[6] *Id.*

22.     Twilio is "a customer engagement platform" used by hundreds of thousands of businesses that allows businesses to "[e]mgage every customer personally on a single platform."[7]

23.     Twilio powers this platform through the Segment API, which offers "world-class customer data infrastructure, so [developers] can design hyper-personalized, omnichannel campaigns across all channels."[8]

24.     Once integrated into a developer's mobile application, the Segment API provides Twilio's platform with "customer identification and segmentation."[9]  It does this by "collecting and connecting data from other tools and aggregating the data to monitor performance, inform decision-making processes, and create uniquely customized user experiences."[10]

25.     The dynamic analysis found that when Criterion Channel Service users with a paid account watch videos on the Website, Defendant discloses to Twilio via the Segment API a user's (i) full name, (ii) e-mail address (unhashed), (iii) user ID, and (iv) the video title, video ID, and video URL of the video the user is watching, including the fact that the user actually viewed the video:

---

[7]     TWILIO,     https://www.twilio.com/en-us/customer-engagement-platform?utm_source=google&utm_medium=cpc&utm_term=twilio%20cloud&utm_campaign=G_S_NAMER_Brand_Twilio_Tier2&cq_plac=&cq_net=g&cq_pos=&cq_med=&cq_plt=gp&gad_source=1&gclid=Cj0KCQjwr9m3BhDHARIsANut04aV4hpizcndzsGOf3_Rr37B__eUSESdj_-eKvA8qm74Md46aqkZJ00aAv2DEALw_wcB.

[8]     TWILIO SEGMENT, TWILIO + SEGMENT ARE BETTER TOGETHER WITH TWILIO ENGAGE, https://segment.com/twilio/.

[9]     Ingrid Lunden, *Twilio Confirms It Is Buying Segment For $3.2b In An All-Stock Deal*, TECHCRUNCH, Oct. 12, 2020, https://techcrunch.com/2020/10/12/twilio-confirms-it-is-buying-segment-for-3-2b-in-an-all-stock-deal/.

[10]     INDICATIVE, SEGMENT.IO DEFINED, https://www.indicative.com/resource/segment-io/.

```
URL: https://api.segment.io/v1/p
PostData PARAM:
  timestamp: 2024-07-19T16:59:43.922Z
  type: page
  path: /heisei-era-godzilla/season:1/videos/godzilla-vs-biollante
  referrer: https://www.criterionchannel.com/heisei-era-godzilla
  search:
  title: Godzilla vs. Biollante - Heisei-Era Godzilla - The Criterion Channel
  url: https://www.criterionchannel.com/heisei-era-godzilla/season:1/videos/godzilla-vs-biollante
  collection_id: 1036050
  device: web
  device_id: None
  name: video
  platform: web
  platform_id: None
  platform_version: None
  product_id: 39621
  site_id: 59054
  timestamp: 1721408383921
  type: platform
  user_email: blimalamamama@gmail.com
  user_id: 64513575
  video_id: 3269060
  view: video
  session_id: 895aa9bb2fe1b023ae5985bc19353652
  collection_title: Heisei-Era Godzilla
  video_title: Godzilla vs. Biollante
  name: video
  name: The Criterion Channel
  version: None
  externalIds: {'collection': 'users', 'encoding': 'none', 'type': 'vimeo_id', 'id': '64513575'}
  locale: en-US
  timezone: America/New_York
  name: Penelope Strickland
  email: blimalamamama@gmail.com
  vimeo_id: 64513575
  path: /heisei-era-godzilla/season:1/videos/godzilla-vs-biollante
  referrer: https://www.criterionchannel.com/heisei-era-godzilla
  search:
  title: Godzilla vs. Biollante - Heisei-Era Godzilla - The Criterion Channel
  url: https://www.criterionchannel.com/heisei-era-godzilla/season:1/videos/godzilla-vs-biollante
```

26.     The analysis also found that when Criterion Channel Service users with a paid account watch content on either the iOS or Android version of the App, Defendant discloses to Twilio via the Segment API a user's (i) full name, (ii) e-mail address (unhashed), (iii) user ID (and advertising ID for Android), and (iv) the video title, video ID, and video interactions of the video the user is watching, including the fact that the user actually viewed the video.  The iOS version of the Criterion Channel Service disclosed the following to Twilio:

```
(packet) outbound to api.segment.io:443 not encrypted at time Mon Jul 22 2024  (1721651277.651815) uuid
6a1f52be-f53f-4abf-a0fd-d4e3571a78ce
--------------------------------
POST /v1/batch HTTP/2.0


"timezone": "America\/New_York",
"traits": {
"anonymousId": "B07384D0-1310-42CB-A32D-DB342F88BCDE",
"email": "peppymay@yahoo.com",
"name": "Penelope Strickland",
"vimeo_id": "64533512"
},
"userAgent": "ios site\/59054 ios-app\/8.800.1"
},
"event": "Video Playback Paused",
"integrations": {
},
"properties": {
"collection_id": "1033055",
"collection_title": "Heisei-Era Godzilla",
"current_src":
"https:\/\/player.vimeo.com\/skyfire\/redirect\/965718262.m3u8?avc=0&drm=1&drm_system=vimeo&expires=172166577
0&f=fmp4&hevc=1&ignore_roku=1&max_height=2160&prefer_hfps=0&pssh=0&sig=2bab2de0c28b8b74cd80868ad0e818d80a9f92
98&text_tracks=1&uhd_ua_detect=0",
"current_type": "application\/x-mpegurl",
"device": "iphone",
"device_id": "32A9BA26-8DD5-40EC-8AFA-98A98C14CB8B",
"duration": "6296",
"is_airplay": "0",
"is_chromecast": "0",
"is_drm": "1",
"is_fullscreen": "0",
"is_live": "0",
"is_trailer": "0",
"name": "Video Playback Paused",
"platform": "iphone",
"platform_id": "3447",
"platform_version": "v8.800.1",
"product_id": "39621",
"session_id": "QM9OZD6F-0196-KA9Y-NK7G-ZSNIUGBHX0JH",
"site_id": "59054",
"timecode": "122",
"timestamp": "1721651494",
"type": "video",
"user_email": "peppymay@yahoo.com",
"user_id": "64533512",
"video_id": "3269060",
"video_title": "Godzilla vs. Biollante"
```

27.     Similarly, the Android version of the Criterion Channel Service disclosed the following to Twilio:

```
(packet) com.criterionchannel outbound to  api.segment.io:443 (35.81.90.104) encrypted at time Mon Aug 12
17:01:57.31 2024 (1723482117031) uuid d528712c-630b-49c7-8bce-38ffeeb944e7_s5
-------------------------------
POST /v1/import HTTP/1.1

"timezone": "America/Los_Angeles",
"traits": {
"anonymousId": "0a8ba6ac-efca-4cbd-983e-5b22eb244e83",
"email": "lari.shirokaka@gmail.com",
"name": "Lari Shirokaka",
"vimeo_id": "61091066"
},
"userAgent": "Dalvik/2.1.0 (Linux; U; Android 12; AOSP on sargo Build/SP2A.220505.008)"
},
"event": "Video Playback Buffer Started",
"integrations": {
},
"messageId": "adebd987-d06a-4080-b401-010b4418699f",
"properties": {
"current_src":
"https://player.vimeo.com/skyfire/redirect/991719993.mpd?avc=8&drm=1&drm_system=vimeo&expires=1723496492&f=fm
p4&hevc=1&ignore_roku=1&max_height=2160&prefer_hfps=8&pssh=0&sig=4ee6ffe111db1e7fd611a35bc49fc5e2b8938024&tex
t_tracks=1&uhd_ua_detect=0",
"current_subtitle": "None",
"current_type": "application/dash+xml",
"device": "android",
"device_id": "ez5j1OpFTPiJSwwURZkWHL",
"duration": "8008.0",
"is_airplay": "0.0",
"is_chromecast": "0.0",
"is_drm": "1.0",
"is_fullscreen": "1.0",
"is_live": "0.0",
"is_trailer": "0.0",
"name": "Video Playback Buffer Started",
"platform": "android",
"platform_id": "3449.0",
"platform_version": "v8.703.1",
"session_id": "3ab79ae5-c910-4714-ab9b-eff7992cf69f",
"site_id": "59054.0",
"timecode": "0.0",
"timestamp": "1.723482093E9",
"type": "video",
"user_email": "lari.shirokaka@gmail.com",
"user_id": "61091066",
"video_id": "3308698.0",
"video_title": "Licorice Pizza"
},
"timestamp": "2024-08-12T17:01:33.091Z",
"type": "track"
},
...
```

```
...
"device": {
"adTrackingEnabled": "true",
"advertisingId":
"aa49149c-8cf1-425c-aa18-903412cd08b8",
"id":
"1335c195d1337d8708fc79cb98c718b9f7bd00df9c2f83e783
fe3d82f2504ba7",
"manufacturer": "Google",
"model": "AOSP on sargo",
"name": "sargo",
"type": "android"
},
...
```

28.     Defendant also integrates into its Website and App the Vimeo OTT API, an API owned and operated by Vimeo, Inc.

29.     The Vimeo OTT API allows users (such as Criterion) to host and sell streaming content, such as the Criterion Channel.  However, it also functions to provide detailed analytics for advertising purposes.

30.     The analysis found that when Criterion Channel Service users with a paid account watch content on the Website, Defendant discloses to Vimeo via the Vimeo OTT API a user's (i)

e-mail address (unhashed), (ii) user ID, and (iii) the video title, video ID, and video URL of the video the user is watching, including the fact that the user actually viewed the video:

```
URL: https://collector.vhx.tv/pixel.gif
URL PARAM:
  collection_id: null
  device: web
  device_id: null
  name: view
  platform: web
  platform_id: null
  platform_version: null
  product_id: null
  referrer: https://www.criterionchannel.com/browse
  site_id: 59054
  timestamp: 1721408382418
  type: platform
  url:
https://www.criterionchannel.com/heisei-era-godzilla/season:1/videos/godzilla-vs-biollante
  user_email: blimalamamama@gmail.com
  user_id: 64513575
  video_id: 3269060
  view: collection
  session_id: 895aa9bb2fe1b023ae5985bc19353652
  location: https://criterionchannel.vhx.tv/heisei-era-godzilla
  id: 3269060
  context: site_context_series
  label: Godzilla vs. Biollante
```

31.     The analysis also found that when Criterion Channel Service users with a paid account watch content on either the iOS or Android version of the App, Defendant discloses to Vimeo via the Vimeo OTT API a user's (i) e-mail address (unhashed), (ii) user ID, and (iii) video ID and video interactions of the video the user is watching, including the fact that the user actually viewed the video.  The iOS version of the Criterion Channel Service disclosed the following to Vimeo:

```
0EC-8AFA-98A98C14CB8B&duration=3480&is_airplay=0&is_chromecast=0&is_drm=1&is_fullscreen=0&i
s_live=0&is_trailer=0&name=pause&platform=iphone&platform_id=3447&platform_version=v8.800.1
&product_id=39621&session_id=QM9OZD6F-0196-KA9Y-NK7G-ZSNIUGBHX0JH&site_id=59054&timecode=12
1&timestamp=1721651645&type=video&user_email=peppymay@yahoo.com&user_id=64533512&video_id=3
269017 HTTP/2.0
```

32.     Similarly, the Android version of the Criterion Channel Service disclosed the following to Vimeo:

```
4-ab9b-eff7992cf69f&site_id=59054.0&timecode=0.0&timestamp=1.7234821E9&is_trailer=0.0&type=
video&user_email=lari.shirokaka%40gmail.com&user_id=61091066&video_id=3308698.0 HTTP/2
```

**B.    Defendant Discloses Class Members' Full Names to Twilio**

33.    As the dynamic analysis established, Defendant discloses to Twilio, through the Segment API, a user's full name when a user streams content on the Criterion Channel Service. The following screenshot of the dynamic analysis depicts Defendant transmitting a Website users' full name to Twilio via the Segment API:


name: Penelope Strickland

34.    Defendant also discloses to Twilio, through the Segment API an Android App user's full name.


"name": "Lari Shirokaka",

35.    Defendant also discloses to Twilio, through the Segment API, an iOS App user's full name.


"name": "Penelope Strickland",

36.    As such, the identity of the individual is directly revealed to third parties in the form of the user's full name, along with the specific content a user viewed.

**C.    Defendant Discloses Class Members' User IDs and Android Advertising IDs to Twilio and Vimeo**

37.    The dynamic analysis also found that Defendant discloses to Twilio through the Segment API the user IDs of Website and App users.  Further, Defendant also discloses Android App users' Android Advertising IDs ("AAID") to Twilio via the Segment API.

38.    The following screenshot shows Defendant disclosing to Twilio through the Segment API a Website user's user ID.  In the transmission, Defendant labels it both "vimeo-id" and "user_id."  The disclosed identifier, "64513575," remains the same regardless of its label.


user_id: 64513575  vimeo_id: 64513575

39. In addition, Defendant also discloses App users' user IDs to Twilio through the Segment API. The following images are representative.



*Android App user*                    *iOS App user*

40. Defendant provides third parties with backend tools to identify which user a so-called "vimeo_id" or "user_id" relates to. This, in turn, provides Defendant and the third parties with an additional layer of specification when identifying individual users, a added bonus that Defendant uses to boost its marketing, analytics, and advertising of individual users based on their collected personally identifiable information.

41. Further, as shown below, Defendant discloses to Twilio through the Segment API an Android user's AAID.

42. An AAID is a unique string of numbers which attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[11] So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

43. Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the field that they are almost never manually reset by users (or

---

[11] *See* ADVERTISING ID, https://support.google.com/googleplay/android-developer/answer/ 6048248.

else an AAID would be of no use to advertisers).  *See also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

44.     Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[12]  Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[13]

45.     Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

46.     By disclosing users' AAIDs and user IDs to third parties such as Twilio, Defendant discloses information that an ordinary person could use to identify its users.

**D.     Defendant Discloses Class Members' E-Mail Addresses to Twilio and Vimeo**

47.     An e-mail address is a unique string of characters which designate an electronic

---

[12] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST, Oct. 19, 2017, https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[13] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/

mailbox.  As industry leaders,[14] trade groups,[15] and courts[16] agree, an ordinary person can use an e-mail address to uniquely identify another individual.  Indeed, there exist multiple services that enable their clients to look up who owns a particular e-mail address.[17]

48.    As the dynamic analysis established, Defendant discloses to Twilio, through the Segment API, and Vimeo, through the Vimeo OTT API, a user's e-mail address when a user streams content using the Criterion Channel Service.

**E.    Defendant Discloses Class Members' Video-Viewing Information to Twilio and Vimeo**

49.    *Twilio.*   As the dynamic analysis established, Defendant discloses to Twilio, through the Segment API, the full title of the video viewed by the user for Website, Android App users, and iOS App users.  The following screenshot shows Defendant disclosing a Website users' watched video title to Twilio:



50.    To further specify precisely which video a Website user watched, Defendant simultaneously discloses the Universal Resource Locator ("URL") that the watched video can be

---

[14] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, Ad Exchanger (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[15] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[16] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[17] *See*, *e.g.*, EXPERIAN IDENTITY APPEND, https://docs.experianaperture.io/identity-append/experian-identity-append/overview/introduction/#reverse-email-append ("Reverse email append … allows you to input an email address and receive the name and address of the individual associated with that email.").

found at.  Even an ordinary person can identify the video from the disclosed URL.  For example, the following Google search shows the disclosed URL.  If searched while signed into an existing Criterion Channel account, the URL would have taken even an ordinary person directly to the watched video.



51.    Further, the dynamic analysis also captured Defendant disclosing an Android App user's watched video and its video ID to Twilio:

```
user_id : 0103/000 ,
"video_id": "3308698.0",
"video_title": "Licorice Pizza"
```

52.    Similarly, the dynamic analysis captured Defendant disclosing an iOS App user's watched video and its video ID to Twilio:

```
user_id : 04333312 ,
"video_id": "3269060",
"video_title": "Godzilla vs. Biollante"
```

53.    ***Vimeo.***   As the dynamic analysis established, Defendant discloses to Vimeo, through the Vimeo OTT API, the full name of the video viewed by Website users, and the watched video's video ID for Android App users, and iOS App users.   The following image shows

Defendant disclosing a Website user's watched video:

```
type: platform
url:
https://www.criterionchannel.com/heisei-era-godzilla/season:1/videos/godzilla-vs-biollante
```

54.    As mentioned above, a URL alone is sufficient to allow even an ordinary person to determine which video a user watched.  To further specify precisely which video a Website user watched, Defendant also discloses to Vimeo via the Vimeo OTT API a watched video's video ID and the full title:

```
video_id: 3269060
view: collection
session_id: 895aa9bb2fe1b023ae5985bc19353652
location: https://criterionchannel.vhx.tv/heisei-era-godzilla
id: 3269060
context: site_context_series
label: Godzilla vs. Biollante
```

55.    In addition, the dynamic analysis captured Defendant disclosing an Android App user's watched video to Vimeo through the Vimeo OTT API in the form of video ID.  Defendant discloses the video ID to Vimeo, which has backend tools to connect the disclosed video ID to a specific video the same way a video title can be connected to a specific video.



| *Android App user* | *iOS App user* |

56.    Defendant discloses a user's video-viewing information to Twilio and Vimeo all in one transmission such that the title of the video, the video ID, video URL, the user's name, email address, and user ID are all viewable together.  From this information, any ordinary person can identify which user watched what videos.

## IV.    DEFENDANT DISCLOSES CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

57.    Defendant transmits its users' names, e-mail addresses, user ID, and video-viewing information to Twilio via the Segment API so that Defendant can analyze user data, launch

marketing campaigns, and target specific users or specific groups of users for advertisements. All of this, especially in conjunction with Segment's marketing and advertising services, helps Defendant monetize the Criterion Channel Service and maximize revenue by collecting and disclosing as much PII as possible to Twilio via the Segment API.

58.    Twilio entices developers to integrate the Segment API by underscoring its signature feature: "Engage." Engage "uses Segment Identity Resolution to take event data from across devices and channels and intelligently merge it into complete user- or account-level profiles."[18] This allows Twilio and Defendant to "understand a user's interaction across web, mobile, server, and third-party partner touch-points in real time, using an online and offline ID graph with support for cookie IDs, device IDs, emails, and custom external IDs," which are all "matched to one persistent ID"[19]:



---

[18] ENGAGE INTRODUCTION, SEGMENT, https://segment.com/docs/engage/.

[19] IDENTITY RESOLUTION OVERVIEW, SEGMENT, https://segment.com/docs/unify/identity-resolution/.

59.    Once Twilio has built these comprehensive user profiles for Defendant, Twilio can then "group customers based on commonly used methods: demographic, psychographic, and geographic"[20]:



60.    Twilio leverages these profiles to help website operators and/or app developers, like Defendant, enhance their marketing, advertising, and analytics efforts "by enriching dynamic/custom properties with profile traits in marketing tools."[21]

61.    Defendant discloses users' PII to Twilio, through the Segment API, so it can better target its marketing campaigns.  Defendant does this through Twilio's "Audience" feature, which "let[s] you group users or accounts based on event behavior and traits that Segment tracks."[22]

---

[20] CUSTOMER SEGMENTATION TOOLS | SEGMENT, https://segment.com/growth-center/customer-segmentation/tools-software/.

[21] PROFILE API, SEGMENT, https://segment.com/docs/unify/profile-api/.

[22] ENGAGE AUDIENCE OVERVIEW, SEGMENT, https://segment.com/docs/engage/audiences/.

62.     In other words, Audiences allows for targeted marketing at Engage profiles that fit specific parameters.  Defendant builds these marketing campaigns through Twilio's services.

63.     Defendant also discloses users' PII to Twilio, through the Segment API, so it can better target advertisements.  After Defendant discloses users' PII, Twilio compiles and transmits that information to other third parties "to personalize messages across channels, optimize ad spend, and improve targeting."[23]   These third parties include Facebook, Google, and Salesforce.[24]

64.     Defendant discloses users' PII to Twilio, through the Segment API, so it can better measure and analyze the Criterion Channel Service's performance.  Defendant does this by leveraging Twilio's "Audiences" feature, which breaks down user profiles into a number of traits, like "total minutes watched."[25]

65.     Further, Defendant transmits its users' e-mail addresses, user ID, and video-viewing information to Vimeo via the Vimeo OTT API for the purposes of marketing, analyzing, and advertising the Criterion Channel Service, all of which helps Defendant monetize the Criterion Channel Service.

66.     Indeed, Vimeo entices developers to use Vimeo OTT for hosting content because it has "advanced analytics tools" and "built-in marketing and promotion tools to grow your audience."[26]   These tools are promoted to help Defendant "[a]ttract more subscribers."

---

[23] USING YOUR ENGAGE DATA, SEGMENT, https://segment.com/docs/personas/using-personas-data/.

[24] *Id.*

[25] COMPUTED TRAITS, SEGMENT, https://segment.com/docs/unify/traits/computed-traits/.

[26] https://vimeo.com/ott.

67. As such, the Vimeo OTT API helps Defendant monetize the Criterion Channel Service and maximize revenue by collecting and disclosing as much PII as possible to Vimeo via the Vimeo OTT API.

## V. DEFENDANT KNOWINGLY DISCLOSES CLASS MEMBERS' PII TO TWILIO AND VIMEO

68. Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses to Twilio and Vimeo Criterion Channel Service users' personally identifiable information and video-viewing information.

69. *First*, as outlined above, Defendant "knew that it was collecting data from users that identified personalized information about them because, in exchange for the data, [Twilio] provided [Defendant] with analytics allowing it to provide advertisements tailored to specific users." *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 31 (D. Mass. 2024). The same is true for Vimeo, as Vimeo specifically advertises on its website that one benefit of using its Vimeo OTT API is that it has "advanced analytics tools" and "built-in marketing and promotion tools to grow your audience."[27] These tools are promoted to help Defendant "[a]ttract more subscribers."

70. *Second*, Criterion Channel has made its partnership with Vimeo known since at least 2019. In an article on going solo, Criterion noted that "Vimeo provides technical services on the backend, with Criterion employing a handful of full-time staffers committed to curating the service."[28]

71. *Third*, common sense dictates that a sophisticated media industry participant like Defendant—who integrated the Segment API and Vimeo OTT API precisely for their marketing,

---

[27] https://vimeo.com/ott.

[28] Eric Kohn, *Criterion Channel Lives! Company President Explains Going Solo After FilmStruck's Death*¸ INDIEWIRE (Apr. 8, 2019), https://www.indiewire.com/features/general/criterion-channel-after-filmstruck-1202056861/.

advertising, and analytics capabilities—is fully aware of the scope of the data that Twilio and Vimeo collect.  Indeed, Defendant would need to contract with Segment and Vimeo specifically for their marketing, advertising, and analytics services, in order for the technologies here at issue to be implemented into the Criterion Channel Service.

72.     Therefore, Defendant knowingly and intentionally provides personal information and video-viewing information to Segment and Vimeo for marketing, advertising, and analytics services.

## VI.     EXPERIENCE OF PLAINTIFF

73.     In or around June 2022, Plaintiff Francis Lucchese-Soto created an account and purchased a subscription to The Criterion Channel.  Shortly thereafter, Plaintiff began watching content on the Criterion Channel.  From June 2022 to the present, Plaintiff regularly watched prerecorded videos on his Apple iPad and has continued to watch content on the Criterion Channel through 2024.

74.     Plaintiff provided Defendant with his name, e-mail address, and credit card information as part of signing up for the Criterion Channel Service.

75.     At all relevant times, Plaintiff never consented to, agreed to, or otherwise permitted Defendant's disclosure of his PII to third parties, including Segment.

76.     Likewise, Defendant never gave Plaintiff the opportunity to prevent the disclosure of his PII to third parties, including Segment.

77.     Nevertheless, each time Plaintiff viewed a pre-recorded video on the Criterion Channel Service, Defendant disclosed Plaintiff's PII to Twilio via the Segment API and to Vimeo via the Vimeo OTT API.  Specifically, Defendant disclosed Plaintiff's: (i) name, (ii) e-mail address, (iii) user ID, and (iv) video-viewing information including the video title, and video ID

of the video Plaintiff watched, including the fact that Plaintiff actually viewed the video.

78.    Using this information, Twilio and Vimeo were able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff.  Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to Twilio and Vimeo. Twilio and Vimeo compiled Plaintiff's PII and activity on the Criterion Channel Service (including video-viewing information), which Defendant used and continues to use for marketing, advertising, and analytics purposes.

## THE PARTIES

79.    Plaintiff Francis Lucchese-Soto is, and has been at all relevant times, a resident of Arlington Heights, Illinois and has an intent to remain there, and is therefore a citizen of Illinois.

80.    Defendant The Criterion Collection, LLC is a Delaware limited liability company with its principal place of business at 215 Park Ave S, New York, New York 10003.  Defendant develops, owns, and operates the Criterion Channel Service, which is available throughout the United States.

## JURISDICTION AND VENUE

81.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

82.

83.    This Court has general personal jurisdiction over Defendant because it is headquartered in this District and therefore is at home in New York.

84.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, and because Defendant resides in this District.

## CLASS ALLEGATIONS

85.    **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who used the Criterion Channel Service to watch videos and had their PII transmitted to a third party without consent (the "Class").

86.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

87.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the Class.  However, given the popularity of the Criterion Channel, the number of persons within the Class is believed to be in the hundreds of thousands and therefore so numerous that joinder of all members is impractical.

88.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a)    whether Defendant collected Plaintiff's and Class members' PII;

(b)    whether Defendant unlawfully disclosed and continues to disclose Criterion Channel users' PII, including their video viewing records, in violation of the VPPA;

(c)    whether Defendant's disclosures were committed knowingly; and

(d)    whether Defendant disclosed Plaintiff's and Class members' PII without consent.

89.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, watched videos on the Criterion Channel Service (specifically, the App) and had his PII collected and disclosed by Defendant to third

parties, such as Twilio and Vimeo.

90.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff can fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims, of the type reasonably expected to be raised by members of the Class, and Plaintiff will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant takes.

91.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action

24

as a class action.

## CAUSE OF ACTION

### COUNT I
### VIOLATION OF THE VPPA,
### 18 U.S.C. § 2710

92.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

93.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

94.     Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as Defendant provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via the Criterion Channel Service.

95.     Plaintiff and members of the Class are "consumers" as defined by the VPPA.  18 U.S.C. § 2710(a)(1).  As to members of the Class who downloaded the App, they are "consumers" because they downloaded, installed, created an account, paid for, and watched pre-recorded videos using the Criterion Channel App.  *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487-89 (1st Cir. 2016).  As to members of the class who used the Website, they are "consumers" because they created an account with Defendant for the provision of video services, "provide[d] consideration in the form of" payment for a subscription and received benefits in exchange (*e.g.*, access to the Criterion Channel's library), and otherwise established a "commitment, relationship, or association" with Defendant.  *Id.* at 488-89 (cleaned up).  Under the VPPA, therefore, Plaintiff and members of the Class are "subscribers" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

96.     Plaintiff and members of the Class viewed pre-recorded videos using the Criterion Channel Service.  During these occasions, Defendant disclosed Plaintiff's and Class Members' PII to Twilio and Vimeo, both third parties.  Specifically, Defendant disclosed Plaintiff's and Class members': (i) name, (ii) e-mail address, (iii) user ID, and (iv) the title of the videos Plaintiff and Class members watched and the video ID, including the fact that Plaintiff and members of the Class actually viewed the videos.

97.     The information disclosed by Defendant constitutes "personally identifiable information" because it makes it "reasonably and foreseeably likely to reveal which [Criterion Channel] videos [Plaintiff and members of the Class] [] obtained."  *Yershov*, 920 F.3d at 486; *see also* 18 U.S.C. § 2710(a)(3).  Indeed, the information disclosed by Defendant to Twilio and Vimeo enables even an ordinary person to identify which specific videos were watched by Plaintiff or specific members of the Class.

98.     Defendant's transmissions of Plaintiff's and Class members' PII to Twilio and Vimeo via the Segment API and Vimeo OTT API constitute "knowing[] disclosures" of Plaintiff's and members of the Classes' "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

99.     Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties, including Twilio and Vimeo.

100.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Twilio and Vimeo were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

101.    On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief;

(ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: September 27, 2024                              Respectfully submitted,

                                                      **BURSOR & FISHER, P.A.**

                                                      By: */s/ Yitzchak Kopel*
                                                              Yitzchak Kopel

                                                      Yitzchak Kopel
                                                      Max S. Roberts
                                                      Victoria X. Zhou
                                                      1330 Avenue of the Americas, 32nd Floor
                                                      New York, NY 10019
                                                      Telephone: (646) 837-7150
                                                      Facsimile: (212) 989-9163
                                                      E-Mail: ykopel@bursor.com
                                                              mroberts@bursor.com
                                                              vzhou@bursor.com

                                                      *Attorneys for Plaintiff*